J-S46044-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.W., FATHER | : | No. 3375 EDA 2015 |

Appeal from the Decree October 13, 2015
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000610-2015

BEFORE: BENDER, P.J.E., OTT, STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:                    **FILED JULY 25, 2016**

B.W. (Father) appeals from the decree entered October 13, 2015, in the Court of Common Pleas of Philadelphia County, which terminated involuntarily his parental rights to minor daughter, A.M.P., born in February of 2014 (Child), pursuant to 23 Pa.C.S. § 2511(a)(1), (a)(2), and (b).[1] We affirm.

The trial court summarized the factual and procedural history of this matter as follows.

> On March 17, 201[4], [the Philadelphia Department of Human Services (DHS)] received a General Protective Services (GPS) [report] alleging that [M.F.], [M]other's paramour, handled

---

* Retired Senior Judge assigned to the Superior Court.

[1] The trial court entered a decree terminating voluntarily the parental rights of Child's mother, T.A.P. (Mother), that same day. The disposition of Mother's appeal is by separate memorandum.

[Child] inappropriately – dropping her roughly on the bed. Furthermore, the report alleged that [M]other has a history of drug use. DHS recommended that [M]other remove her paramour from the residence. [M]other failed to comply with the recommendation that she remove [C]hild from the environment. Moreover, the report alleged that [M]other is fearful in her home and is afraid to leave the home. The report was substantiated.

On March 18, 2014, DHS received a supplemental report alleging that [M]other transported [C]hild to St. Christopher's Hospital for Children because [C]hild was continuously crying. The report alleged that [M]other stated that [C]hild would not drink her milk. The only food that the mother gave to [C]hild for the day was two bottles of water. Furthermore, [C]hild had severe diaper rash and was dehydrated. Moreover, [M]other stated that she leaves [C]hild in the care of her paramour who she stated previously slammed [C]hild on the bed. Lastly, [M]other stated that [C]hild did not have a primary care physician and lacked immunizations.

On March 21, 2014, DHS visited [C]hild at St. Christopher['s] Hospital for Children. [M]other stated that she observed her paramour drop [C]hild on the bed. [M]other further stated that she was fearful to return home. Moreover, [M]other stated that she was unable to provide adequate care for [C]hild.

On March 21, 2014, DHS obtained an [O]rder of Protective Custody (OPC) for [C]hild and placed her in a foster care home through Delta Community Services, where she currently remains.

A shelter care hearing was held on March 24, 2014. Master Summers lifted the OPC and ordered the temporary commitment of [Child] to the care and custody of DHS.

On April 1, 2014, an adjudicatory hearing was held before the Honorable Jonathan Q. Irvine. Judge Irvine adjudicated [C]hild dependent and committed her to the care and custody of DHS.

On November 25, 2014, at a permanency hearing before Master Lynne Summers, [Father] presented himself as the putative father. The court ordered a paternity test.

In January, 2015, the paternity test results confirmed [Father] as the biological father with the probability of paternity of 99.9999%.

Trial Court Opinion, 2/2/2016, at 1-2 (unnumbered pages).

On September 21, 2015, DHS filed a petition to terminate involuntarily Father's parental rights to Child. A hearing was held on October 13, 2015. Following the hearing, the trial court entered its decree terminating Father's parental rights. Father timely filed a notice of appeal.[2]

Father presents the following questions to this Court, which we have renumbered for ease of disposition.

1. Did the trial court violate Father's due process right and equal protection of law when it failed to appoint counsel for Father at the inception of the case?

2. Did the trial court abuse its discretion and or commit an err[or of] law when it terminated Father's parental rights without due process of law by not giving Father sufficient time to meet his objectives when additional objectives were added during the goal change hearing and Father was not told about th[e] new objectives?

3. Did the trial court abuse its discretion when it terminated [Father's] parental rights and [F]ather had m[et] his initial

_____

[2] On January 15, 2016, Father's trial counsel filed in this Court a motion to withdraw. In his motion, trial counsel indicated that Father was claiming ineffective assistance of counsel, and that continuing to represent Father would be a conflict of interest. On February 1, 2016, this Court entered an order granting trial counsel's motion to withdraw. In addition, this Court's order directed the trial court to ascertain whether Father was entitled to court-appointed counsel and, if so, to appoint counsel for Father. On February 16, 2016, this Court received an order from the trial court indicating that new counsel had been appointed to represent Father on appeal. Father's appellate counsel has filed a brief on his behalf.

J-S46044-16

objectives but new objectives were added yet Father was not given a reasonable amount of time to complete those additional objectives but was willing to do so to be reunified with his child[?]

Father's Brief at 5 (suggested answers and unnecessary capitalization omitted).

We consider Father's questions mindful of the following.

In cases involving the termination of a parent's rights, our standard of review is limited to determining whether the order of the trial court is supported by competent evidence, and whether the trial court gave adequate consideration to the effect of such a decree on the welfare of the child.

Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand…. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re C.W.U., Jr.*, 33 A.3d 1, 4 (Pa. Super. 2011) (internal quotations and citations omitted).

Our courts apply a two-part analysis in considering termination of parental rights.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re P.Z.*, 113 A.3d 840, 850 (Pa. Super. 2015) (quoting *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007)).

- 4 -

In this appeal, Father does not assert that DHS failed to offer sufficient evidence at the termination hearing to establish that his conduct warranted termination under subsections 2511(a)(1) and (2), or to prove that termination of Father's rights best served the needs and welfare of Child under subsection 2511(b).[3] Instead, Father claims that an attorney should have been appointed for him earlier in the process (before Father was identified as Child's father) and that he was not given enough time to meet his FSP objectives. None of Father's claims entitles him to relief from this Court.

Father first asserts that the trial court violated his rights by failing to provide him with court-appointed counsel at the inception of the case. Father's Brief at 11. He states that DHS made no efforts to determine the identity of Child's father before Father presented himself as the putative

_____

[3] Our review of the record confirms that any such challenge would not merit him relief, as the trial court committed no error of law or abuse of discretion and its relevant factual findings are supported by the record. *See* N.T., 10/13/2015, at 19 (Father repeatedly refused domestic violence counseling); *id.* at 20 (Father declined employment assistance); *id.* at 59 (Father lives in housing that does not allow children); *id.* at 72 (Father waited six months to even start the referred housing program). Further, while Father regularly attended his weekly supervised visitation with Child, he failed to progress past those limited interactions or to demonstrate proper parenting during the visitations. *Id.* at 44 (detailing how Father never changed Child's diaper and had to be redirected to interact with Child rather than speak to the DHS worker about the case). Finally, the record shows that Child would not be harmed by having her ties with Father severed permanently, but is bonded with her foster parents, whom she calls "mom" and "dad." *Id.* at 47, 50.

father in November 2014. *Id.* at 12. In the meantime, Father complains, the trial court had held hearings at which Father was neither present nor represented. *Id.* at 13.

We are utterly unpersuaded that Father was denied his right to counsel or to be heard. Our review of the record reveals that counsel was appointed for Father on November 25, 2014, at or near the time that the trial court first became aware that Father may be Child's father. *See* Exhibit DHS 1. In addition, the record shows that Father was provided with notice of all proceedings after November 25, 2014. *Id.* After Father's paternity of Child was confirmed, DHS immediately established family service plan (FSP) goals for Father and communicated those goals to Father. N.T., 10/13/2015, at 13, 17. From February 2015 to the time DHS filed its petition to terminate Father's parental rights at the end of September 2015, DHS provided services to Father to help him obtain those goals. *Id.* at 18-22.

Father points to no authority to support his argument that the trial court should have provided him with counsel before it was even suggested that he was Child's father, or that it should have declined to hold any hearings concerning Child's immediate need for protection from Mother until such time as Child's father could be identified and located. Father has not established that he was due any more process than he received. Father's first issue warrants no relief. *See*, *e.g.*, *In re G.P.-R.*, 851 A.2d 967, 976 (Pa. Super. 2004) (holding parent received due process rights where he was

represented by counsel and had the opportunity to attend hearings, cross-examine agency's witnesses, and present evidence).

With his remaining issues, Father complains that he should have been given more time to meet his FSP goals. We disagree.

"A child's life, happiness and vitality simply cannot be put on hold until the parent finds it convenient to perform parental duties." *In re Adoption of A.M.B.*, 812 A.2d 659, 675 (Pa. Super. 2002). Father's FSP goals were established and communicated to him eight months before DHS filed the petition to terminate Father's rights. N.T., 10/13/2015, at 13, 17. Father met some of those goals, such as completing a parenting class and attending the weekly visits with Child. However, as discussed above, Father did not even attempt to meet other goals. For example, he steadfastly refused domestic abuse counseling until the termination hearing, at which time he testified that he would take such a class "if you were going to provide me with my daughter" as a result. *Id.* at 67. Father claims to want reunification with Child, yet he resided in no-children-allowed housing, waited at least six months after receiving his housing FSP goal[4] before he

_____

[4] Father complains at one point in his brief that housing, employment, and parenting and domestic violence classes were new goals added to his FSP in May 2015. Father's Brief at 16. However, at another time he acknowledges that he knew housing was a goal as of November 2014. *Id.* According to DHS, all of those goals were set as part of his initial FSP in February 2015. N.T., 10/13/2016, at 13-14, 41.

even began looking into obtaining housing appropriate for Child, and still had no guarantee of suitable housing at the time of the termination hearing. *Id.* at 60, 72.

Father asserts that he was working to meet his income/employment goal at the time of the termination, and that, if given more time, he could have obtained suitable housing. Father's Brief at 16. However, Father offered no explanation for his delay in initiating his work on those goals. Further, DHS witnesses testified[5] that Father showed a lack of comprehension and understanding regarding the instruction he was given, N.T., 10/13/2016, at 45, and that he has made no progress in learning to care for Child, *id.* at 55. Father was defiant with DHS service providers, and hung up the phone when they questioned him on his progress. *Id.* at 39-40.

Under these circumstances, there is no reason to believe that Father would have made progress at a reasonable pace even if he had been given more time. Accordingly, we are unpersuaded that the trial court erred in declining to make Child wait in limbo to see if Father would follow through with his goals rather than be free to be adopted by the foster family with whom she is happy, healthy, and secure.

Decree affirmed.

---

[5] The trial court found the DHS witnesses credible. N.T., 10/13/2015, at 84.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/25/2016